1  SHANNON LISS-RIORDAN (SBN 310719)
   LICHTEN & LISS-RIORDAN, P.C.
2  sliss@llrlaw.com
   729 Boylston Street, Suite 2000
3  Boston, MA 02116
   Telephone: 617.994.5800
4  Facsimile: 617.994.5801

5  Attorneys for Plaintiffs

6

7              UNITED STATES DISTRICT COURT

8            CENTRAL DISTRICT OF CALIFORNIA

9  ADRIANA ORTEGA, *et al.*,          Case No.: 5:17-cv-00206-JGB-KK
   individually and on
10 behalf of all others similarly situated,   **NOTICE OF MOTION AND MOTION
                                              FOR FINAL APPROVAL OF CLASS
11              Plaintiffs,                    ACTION SETTLEMENT AND
                                              MEMORANDUM OF POINTS AND
12         v.                                  AUTHORITIES IN SUPPORT
                                              THEREOF**
13 THE SPEARMINT RHINO
   COMPANIES WORLDWIDE, INC.,       Judge: Hon. Jesus G. Bernal
14 SPEARMINT RHINO
   CONSULTING WORLDWIDE,            Date:        June 15, 2020
15 INC., and MIDNIGHT SUN           Time:        9:00 a.m.
   ENTERPRISES, INC., *et al.*      Courtroom: 1
16
17              Defendants.          Complaint Filed: February 3, 2017
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.   BACKGROUND ................................................................. 3

      A.    Litigation History ................................................ 3

      B.    Mediation Conducted on May 22, 2019 ................ 4

      C.    Terms of the Settlement Agreement .................... 5

      D.    Notice and Claims Process ................................ 6

III.  THE COURT SHOULD GRANT FINAL APPROVAL OF
      THE SETTLEMENT ........................................................ 9

      A.    The Settlement Class Should be Finally Certified ........... 9

      B.    The Court Should Grant Final Approve the Settlement .......... 9

            1.    CAFA Notice ................................................. 10

            2.    Settlement Notice ........................................ 10

            3.    The Settlement is Fair, Reasonable, and Adequate ............ 11

                  a.    Strength of Plaintiffs' Case ........................ 12

                  b.    Risk, Expense, Complexity, and Likely
                        Duration of Further Litigation .................... 13

                  c.    Risk of Maintaining Class Action Status
                        Throughout the Trial ............................ 14

                  d.    Amount offered in Settlement ................... 15

                  e.    Extent of Discovery Completed, and the
                        Stage of the Proceedings ........................ 17

                  f.    Experience and Views of Counsel ............... 17

                  g.    Presence of a Government Participant ......... 19

                  h.    Any Opposition by Class Members ............ 19

            4.    The Court's Inquiry Regarding the FLSA
                  Settlement ................................................ 20

      C.    The Proposed Incentive Payments are Reasonable and
            Justified ........................................................ 24

IV.   CONCLUSION ................................................................. 25

1

# TABLE OF AUTHORITIES

2

**Cases**

3

4

Adoma v. University of Phoenix, Inc.,
    913 F. Supp. 2d 964 (E.D. Ca. 2012) ............................................... 9

5

Bracy v. DG Hospitality Van Nuys, LLC, et al.,
6      No. 17-854 (C.D. Cal.) ................................................................... 3

7

Byrne v. Santa Barbara Hospitality Services, Inc.,
8      2017 WL 5035366 (C.D. Cal. October 30, 2017) .......................... 24

9

Byrne v. Santa Barbara Hospitality Services, Inc.,
10      C.A. No. 17-00527, Dkt. 178 (C.D. Cal. Dec. 14, 2018) ......... 19, 24

11

Byrne v. Santa Barbara Hospitality Services, Inc.,
12      No. 17-527 (C.D. Cal.) ............................................................ passim

13

Chu v. Wells Fargo Investments, LLC,
    2011 WL 672645 (N.D. Cal. Feb. 16, 2011) ................................ 24

14

Cotter v. Lyft, Inc.,
15      193 F. Supp. 3d 1030 (N.D. Cal. 2016) ......................................... 16

16

Covillo v. Specialtys Cafe,
17      2014 WL 954516 (N.D. Cal. Mar. 6, 2014) .................................. 24

18

Daniels v. Aeropostale West, Inc.,
19      2014 WL 2215708 (N.D. Cal. May 29, 2014) ............................... 22

20

Deaver v. Compass Bank,
21      2015 WL 8526982 (N.D. Cal. Dec. 11, 2015) .............................. 16

22

Doe 1-2 v. Deja Vu Servs., Inc.,
23      2017 WL 2629101 (E.D. Mich. June 19, 2017) ............................ 18

24

Does 1-2 v. Deja Vu Servs., Inc.,
    925 F.3d 886 (6th Cir. 2019) ................................................... 13, 18

25

Gonzalez v. BMC W., LLC,
26      No. EDCV1700390JGBRAOX, 2018 WL 6318832 (C.D. Cal. Nov.
27      19, 2018) ................................................................................ passim

28

ii

Harris v. Vector Marketing,
    No. C-08-5198, 2012 WL 381202 (N.D. Cal. Feb. 6, 2012).............................9

Hart v. Rick's Cabaret Int'l Inc.,
    No. 1:09-cv-03043 (S.D.N.Y.) ........................................................................19

Hart v. Rick's Cabaret Int'l, Inc.,
    967 F. Supp. 2d 901 (S.D.N.Y. 2013)............................................................15

In re Apollo Group Inc. Securities Litigation,
    Nos. CV 04-2147-PHX-JAT, CV 04-2204-PHX-JAT, CV 04-2334-
    PHX-JAT, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012)...................................9

In re Celera Corp. Sec. Litig.,
    2015 WL 1482303 (N.D. Cal. Mar. 31, 2015).................................................16

Johnson v. VCG-IS, LLC,
    Case No. 30-2015-00802813 (Super. Ct. Cal. Aug, 31, 2018)........................18

Kakani v. Oracle Corp.,
    2007 WL 1793774 (N.D. Cal. June 19, 2007).................................................22

La Parne v. Monex Deposit Co.,
    2010 WL 4916606 (C.D. Cal. Nov. 29, 2010).................................................22

Linney v. Cellular Alaska P'ship,
    151 F.3d 1234 (9th Cir. 1998) ................................................................. 12, 17

McFeeley v. Jackson St. Entm't, LLC,
    825 F.3d 235 (4th Cir. 2016).........................................................................15

Millan v. Cascade Water Servs.,
    310 F.R.D. 593 (E.D. Cal. 2015)....................................................................16

Morris v. Ernst & Young, LLP,
    834 F.3d 975 (9th Cir. 2016)...........................................................................3

Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,
    221 F.R.D. 523 (C.D. Cal. 2004)..........................................................14, 17, 20

Rodriguez v. W. Publ'g Corp.,
    563 F.3d 948 (9th Cir. 2009)..........................................................................12

Roe v. Jose Torres L.D. Latin Club Bar, Inc.,
    2020 WL 2494569 (N.D. Cal. May 14, 2020) ......................................... 14, 18

iii

<u>Roes, 1-2 v. SFBSC Mgmt., LLC,</u>
    944 F.3d 1035 (9th Cir. 2019)......................................................................21

<u>Selk v. Pioneers Mem. Healthcare Dist.,</u>
    159 F. Supp. 3d 1164 (S.D. Cal. 2016) ......................................................23

<u>Sharobiem v. CVS Pharmacy, Inc.,</u>
    2015 WL 10791914 (C.D. Cal. Sep. 2, 2015)...........................................22

<u>Smith v. Micron Elecs., Inc.,</u>
    2005 WL 5328543 (D. Idaho Feb. 4, 2005)...............................................21

<u>Van Vranken v. Atl. Richfield Co.,</u>
    901 F. Supp. 294 (N.D. Cal. 1995) ............................................................24

<u>Villegas v. J.P. Morgan Chase & Co.</u>
    2012 WL 5878390 (N.D. Cal. Nov. 21, 2012).........................................16

**Other Authorities**

3 Newberg on Class Actions § 11:50 (4th ed. 2012)...........................................13

**Rules**

Fed. R. Civ. P. 23 ...........................................................................1, 2, 9, 21

NYLL § 196-d ...................................................................................14

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## I.    INTRODUCTION

Pursuant to Federal Rule of Procedure Rule 23, Plaintiffs move this Court for an order granting final approval of the class action settlement agreement entered into between Plaintiffs and Defendants The Spearmint Rhino Companies Worldwide, Inc., Spearmint Rhino Consulting Worldwide, Inc., Midnight Sun Enterprises, Inc., and related entities.[1]  The Agreement provides for a $3,650,000 cash settlement fund.  The fund is non-reversionary, so no amount will be returned to Defendants and all funds will be distributed to participating class members (after accounting for reasonable awards of attorneys' fees, litigation costs, PAGA payment, and service payments to the four named and originating Plaintiffs).

The Court granted preliminary approval on January 22, 2020.  Since that time, notice has been distributed consistent with the terms of the settlement, 425 class members have submitted claim forms to claim their share of the Settlement and, pursuant to the terms of the Settlement Agreement, additional claim forms will continue to be accepted and additional notice will be distributed such that this level of participation will surely increase over the coming months.  See discussion at Section III.B.2, *infra*.  At current participation, the average settlement share would be more than $6,000.  Even if the Parties succeed in doubling the level of participation over the coming months through posting of notice at the clubs and

---

[1] Plaintiffs apologize for filing of this Motion six days prior to the final approval hearing.  The claims and objections period for class members ended on June 3, 2020.  On the morning of June 9, 2020, the parties received final information from the settlement administrator regarding the claims rate and other details relevant to final approval.  That information forms much of the basis for this Motion.  Class members have all been notified of the approval hearing scheduled for June 15, 2020 and Plaintiffs' preference is to proceed with the hearing on that date so that additional class notice regarding a new hearing date is not necessary, but Plaintiffs will comply with whatever the Court suggests in that regard.

other means,[2] the settlement shares would still average $3,000, with many class members receiving more.

As set forth below, the proposed class action settlement meets the requirements for preliminary approval under Rule 23(e), as it follows almost three years of hard fought litigation, and was achieved with the assistance of well-known labor and employment mediator.  The Agreement provides for a substantial non-reversionary cash settlement fund of $3,650,000. Notice was provided through various means to potential class members, and that process will continue so that more class members will be given the opportunity to receive their settlement share. The settlement provides more substantial relief than other wage and hour settlements on behalf of exotic dancers and valued all viable claims and potential damages that could have been recovered had the case succeeded at trial, accounting for the various risks of continued litigation. The attorney's fees requested are reasonable (i.e., the benchmark rate of 25% of the fund), and the incentive payments are also reasonable in recognition of the time and effort of the named plaintiffs and the risk that they took in undertaking this litigation.  In sum, the settlement satisfies the requirements of Rule 23(e) and should be approved.

---

[2]    As discussed in greater detail below, it is the experience of the parties that settlement participation in these types of cases is increased through posting of settlement notice at the clubs.  The Settlement Agreement in this case provided for such a notice and it was posted; however, during the entire claims period, the clubs have been closed per order of the State of California due to COVID-19 concerns so there was no one at the clubs to actually view the posted notices.  Fortunately, the Settlement Agreement permits the parties to agree on additional notice procedures and to accept late claim forms, so as soon as the clubs re-open, the parties have agreed to keep  the settlement notice posted for a reasonable period of time and accept any resulting "late" claim forms, which the parties believe will significantly increase participation in the settlement.  Given that the settlement has a payout period of more than two years and several payments, there will be ample time to adjust the settlement shares from these "late" claim forms so that all class members receive their full settlement share.

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## II.    BACKGROUND

### A.    Litigation History

Plaintiff filed this action on February 3, 2017, alleging that Defendants had misclassified exotic dancers at Spearmint Rhino clubs as independent contractors and, in so doing, violated the FLSA and various sections of the California Labor Code. See Dkt. 1. Plaintiff then filed an amended complaint, asserting the same claims plus a PAGA representative action on behalf of Spearmint Rhino dancers in California, arising from Defendants' violations of the Labor Code. See Dkt. 34.

On March 29, 2017, Ms. Ortega moved for conditional certification of the proposed FLSA collective. Dkt. 16. Defendants opposed the motion and filed their own motions to stay the case and to compel Ms. Ortega's claims to arbitration. See Dkt.'s 18, 21. Following full briefing on the motions, the Court held a hearing and subsequently denied Ms. Ortega's motion without prejudice to permit re-filing after additional discovery, denied Defendants' Motion to Compel Arbitration pending a decision in Morris v. Ernst & Young, LLP, 834 F.3d 975 (9th Cir. 2016), cert. granted, No. 16-300, and granted in part Defendants' Motion to Stay (permitting Plaintiff to propound discovery necessary to renew a motion for conditional certification). See Dkt. 48.

While discovery in this matter was ongoing related to Plaintiffs' FLSA claims, Plaintiff's counsel learned that the Defendant clubs had reached a settlement with plaintiffs' counsel in two later-filed cases, Byrne and Bracy. See Bracy v. DG Hospitality Van Nuys, LLC, et al., No. 17-854 (C.D. Cal.); Byrne v. Santa Barbara Hospitality Services, Inc., No. 17-527 (C.D. Cal.). Defendants filed a motion for a protective order to cease discovery in the Ortega matter, arguing that the Byrne settlement would moot Ms. Ortega's claims. See Dkt. 53. Ms. Ortega opposed the motion for the protective order. The parties ultimately agreed to put resolution of the motion on hold until after the Court's consideration of the Byrne and Bracy settlement. See Dkt.'s 58, 59.

When the terms of the <u>Byrne</u> settlement were revealed, Ms. Ortega and a handful of other class members objected to that settlement.  See <u>Byrne</u>, Dkt 90. That settlement covered the claims of approximately 8,500 dancers and, at final approval proposed to pay $350,884 to $598,453 to class members, and an additional $1.7 million in attorney's fees.  <u>Byrne</u>, Dkt. 178 (Order granting final approval).  The settlement was approved on December 14, 2018 over the objections of several dancers, including Ms. Ortega.

While this action was stayed, three other dancers opted-in to this action.  <u>See</u> Dkt. 61, 67.  Two of the opt-in Plaintiffs excluded themselves from the <u>Byrne</u> settlement.  <u>See</u> Dkt. 75 at 5 n.3.  One of the opt-in Plaintiffs, Ms. McCrea, worked for Defendants until April 4, 2019, well after the end of the release period covered by the <u>Byrne</u> settlement.  <u>See</u> Dkt. 67-1.

Following the conclusion of the <u>Byrne</u> approval process, the Parties attended a status conference on March 4, 2019 at which time Plaintiff Ortega expressed her intention to re-move for conditional certification, and Defendants expressed their intention to re-move to compel Plaintiff Ortega's claims to arbitration and to stay this matter.

Following a hearing on these motions, on May 15, 2019, the Court granted Plaintiffs' motion for conditional certification of an FLSA collective action, and FLSA notice was set to issue to a group of more than 1,000 dancers across California. <u>See</u> Dkt. 83.

## B.    <u>Mediation Conducted on May 22, 2019</u>

While the Parties were in the process of conferring regarding the form and process for FLSA notice (pursuant to the Court's conditional certification Order), they attended a non-binding mediation with mediator D. Charles Stohler in Boston, Massachusetts.  Counsel for the <u>Byrne</u> and <u>Bracy</u> plaintiffs were also present.

As a result of this mediation, improvements to the <u>Byrne</u> settlement were negotiated, particularly that "overhead credits" would be eliminated and another

4

round of notice will be distributed to <u>Byrne</u> class members who are subject to the classwide release in that action that was given final approval by the Court on December 14, 2018, so that <u>Byrne</u> class members have an additional opportunity to submit a claim to be paid from the <u>Byrne</u> funds that were otherwise reverting to Defendants.  As a result of these improvements, the remaining objectors who had appealed the Court's final approval order in <u>Byrne</u> have agreed to withdraw their objections and dismiss their appeal.

Plaintiffs in this Action also negotiated a settlement that would resolve the post-<u>Byrne</u> claims of California dancers at fourteen of Defendants' clubs in California for the non-reversionary settlement fund of $3,650,000.  On May 23, 2019, the Parties submitted a joint filing informing the Court that a settlement had been reached and that they were finalizing settlement approval papers.  See Dkt. 85. The specific terms of that settlement are described in the Court's preliminary approval Order (Dkt. 88) and discussed below.

## C.    <u>Terms of the Settlement Agreement</u>

As stated above, the settlement creates a $3,650,000 cash settlement fund. This fund is non-reversionary and therefore no funds will revert to Defendants following administration of the settlement. The settlement funds would be distributed as follows:

- **$100,000** of the fund is designated for Plaintiffs' PAGA claims, 75% of which will be paid to the California Labor and Workforce Development Agency (with the remaining 25% to be added to the distribution to class members).

- **$10,000**, comprised of four incentive payments of $2,500 each to be paid to the originating Plaintiffs who brought this Action (Adriana Ortega, Roberta Friedman, Adriana Avelar and Sheyenne McCrea).

- **$912,500** in requested attorney's fees, comprising 25% of the non-reversionary cash settlement fund with a separate award of costs.

- **$17,000** in requested litigation costs to be paid to Plaintiffs' counsel
- **$2,610,500** in remaining funds to be paid to all class members who submit a claim form, with settlement shares calculated based on the number of "dance days" that each individual performed at Defendants' clubs.

Because no funds revert to Defendants, if the requested attorneys fee award is not approved, it will be added to the amount distributed to class members.

The Rule 23 class is defined to include all individuals who worked as LLC Member or independent contractor exotic dancers at any time during the Settlement Class Period in Defendants' clubs in California from October 30, 2017 to the date of preliminary approval. Agreement, Exhibit 1, at ¶ 1.12.  The class also includes Byrne opt-outs who worked in California.

Class members who do not exclude themselves will release all wage related claims except for claims under the FLSA, and class members who submit claim forms will also release their FLSA claims.  Agreement, Exhibit 1, at ¶¶ 7.1, 7.2.

### D.    Notice and Claims Process

The settlement provided for class notice to be mailed and e-mailed, posted at the relevant clubs, and placed on a settlement website.  Agreement, Exhibit 1, at ¶ 3.1.1.  A reminder notice would be sent via email fourteen days prior to the claims deadline, with additional reminder mailings as necessary. Agreement, Exhibit 1, at 3.1.2. The settlement administration will be paid for through the reversionary funds that had been made available in the Byrne settlement and will not come out of the $3,650,000 Ortega fund. See Agreement, Exhibit 1, at ¶ 5.3.

The Settlement Administrator has undertaken its notice obligations as required by the Settlement Agreement.[3]  Specifically, on March 5, 2020, the Administrator caused the Notice of Settlement of Class Action Lawsuit, the Claim

---

[3] Plaintiffs intend to supplement this filing with a Declaration of the Claims Administrator setting forth additional detail.

Form, and a business reply envelope, to be printed and mailed to the 3,450 names and mailing addresses in the Class List.  Since that date, 1,112 Initial Notices were returned by the USPS with undeliverable addresses and through public records checks, the administrator performed address searches and was able to find updated addresses for 650 Class Members to whom the Initial Notice was re-sent.  The Administrator established a website at www.CAExoticDancerFLSAsettlement.com dedicated to this matter to provide information to the Class Members and to answer frequently asked questions.  The website also provided all relevant case documents.

Email notice was also sent on March 5, 2020, and the email provided a link through which the class member could complete the claim form electronically without having to print and mail or scan the form in order to send it back to the Administrator.

An Email reminder notice as described in the Settlement Agreement was also sent during the week of May 25, 2020.

To date, 425 claim forms have been received by the Administrator, constituting approximately 12% of the class.  The parties believe that this lower-than-expected level of participation is due to the fact that the Agreement provided for notice of the settlement to be posted at the clubs, but they have been closed for almost the entirety of the notice and claims period due to the pandemic and therefore none of the current dancers (many of whom are settlement class members) have been able to view the notice in-person.  It is the experience of the parties that settlement participation in these types of cases is increased through posting of settlement notice at the clubs.  Fortunately, the Settlement Agreement permits the parties to agree on additional notice procedures and to accept late claim forms, so as soon as the clubs are re-opened the parties have agreed to post the settlement notice and accept any resulting "late" claim forms, which the parties believe will significantly increase participation in the settlement, likely to as high as 20% participation.  Given that the settlement has a payout period of more than two years

and several payments (described below), there will be ample time to adjust the settlement shares from these "late" claim forms so that these class members receive their full settlement share.

Assuming the Court grants final approval, the settlement fund will be paid and distributed over several years. Within thirty days of the effective date of the settlement, Defendants shall pay the first $800,000 towards their obligations under the Settlement, which shall thereafter be distributed on a *pro rata* basis for claiming class members, PAGA payment, and Court-approved attorney's fees and costs, with full payment of the Court-approved incentive awards. The Parties estimate that this first distribution will be in the summer of 2020, but it will be contingent on when the settlement obtains final approval.

Following the first <u>Ortega</u> payment (the funds for which are already in possession of the claims administrator and ready for distribution), Defendants shall complete their payment obligations under the <u>Byrne</u> settlement, and then resume payments under the <u>Ortega</u> settlement in the amount of no less than $150,000 per month.[4] Thus, it will take an additional 19 months to complete full payment of the <u>Ortega</u> settlement after the payment in <u>Byrne</u> is complete (comprised of the $800,000 initial payment, and then 19 monthly payments of $150,000, equaling the total $3,650,000 <u>Ortega</u> settlement fund).

The practical result of this payment schedule is that, based on the Parties' reasonable estimates, there will be a first distribution of funds to Ortega class members in the summer of 2020 (described above), a second distribution under the <u>Ortega</u> settlement in 2021 to claiming class members, a third distribution in 2022 to

---

[4] It should be noted that the pandemic has caused all of Defendants clubs to be closed since mid-March resulting in challenges complying with the payment plan and these issues are being discussed by and between counsel in both <u>Byrne</u> and <u>Ortega</u>, and the goal is to get back on track once the clubs are permitted to reopen. This will not affect the first payment of $800,000 under the settlement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

claiming class members, and a final distribution in 2023 to claiming class members.[5]

This extended payment period is a result of financial challenges faced by the Defendant clubs arising from recent changes to their business model, reflecting the reality that Defendants would not be able to satisfy a larger judgment or settlement at this time.

## III.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

### A.    The Settlement Class Should be Finally Certified

In its Preliminary Approval Order, the Court certified the Settlement Class in this matter under Rules 23(a) and 23(b)(3).  As the Court has previously observed in similar cases, it "need not find anew that the settlement class meets the certification requirements of Rule 23(a) and (b)." Adoma v. University of Phoenix, Inc., 913 F. Supp. 2d 964, 974 (E.D. Ca. 2012); see also Harris v. Vector Marketing, 2012 WL 381202 at *3 (N.D. Cal. Feb. 6, 2012) ("As a preliminary matter, the Court notes that it previously certified . . . a Rule 23(b)(3) class . . . [and thus] need not analyze whether the requirements for certification have been met and may focus instead on whether the proposed settlement is fair, adequate, and reasonable."); In re Apollo Group Inc. Securities Litigation, 2012 WL 1378677 at *4 (D. Ariz. Apr. 20, 2012). Here, the Settlement Class has not changed since it was conditionally certified and class certification for (settlement purposes only) remains appropriate.

### B.    The Court Should Grant Final Approve the Settlement

At the final approval stage courts 1) assess whether the parties have met notice requirements under the Class Action Fairness Act; 2) determine whether the

---

[5]  Only amounts from uncashed checks in the final distribution of settlement funds will be sent to a *cy pres* beneficiary.

9

notice requirements of Federal Rule of Civil Procedure 23(c)(2)(B) have been satisfied; and 3) analyze whether the proposed settlement is fair, reasonable, and adequate under Rule 23(e).  Gonzalez v. BMC W., LLC, 2018 WL 6318832, at *4 (C.D. Cal. Nov. 19, 2018)

### 1.  CAFA Notice

In compliance with the Class Action Fairness Act ("CAFA"), 28 U.S.C. Section 1715, the Administrator compiled a CD-ROM containing the following documents: Class Action and Collective Action Complaint, First Amended Class, Collective and Representative Action Compliant, Second Amended Class Action and Collective Action Complaint, Defendants Amended Notice of Related Cases Pursuant to Local Rules 83-1.3 and 83-1.3.3, Order Granting Plaintiffs Unopposed Motion for Preliminary Approval of Class Action Settlement, Joint Notice of Proposed Class Action Settlement, [Proposed] Order Granting Preliminary Approval of Class Action Settlement, Notice of Settlement of Class Action Lawsuit, Class Action Claim Form, Stipulation and Settlement Agreement Dated as of December 16, 2019, and a cover letter (collectively, the "CAFA Notice Packet"). On January 31, 2020, the Administrator caused 64 CAFA Notice Packets to be mailed via Priority Mail from the U.S. Post Office in Memphis, Tennessee to the U.S. Attorney General, the Attorneys General of each of the 50 states in which Settlement Class Members reside and the District of Columbia.  The Administrator has received no response to the CAFA Notice Packet from any of the recipients.[6]

### 2.  Settlement Notice

As described above, settlement notice has been effectuated by mailing the notice via first class mail, an initial email notice to all class members with a means

---

[6] Plaintiffs will file a supplemental Declaration of the Administrator attesting to these facts.

to complete a claim form electronically, through a website maintained by the Administrator, and through a reminder email notice sent the week of May 25, 2020 (approximately two weeks before the close of the claims period).  Notice has also been posted at the clubs and will remain after the reopen following the pandemic closures so that additional claim forms will be accepted.

### 3.  The Settlement is Fair, Reasonable, and Adequate

Rule 23(e)(2) instructs a court to examine the following when assessing the fairness of a proposed class action settlement.

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

The Ninth Circuit has similarly identified a list of factors that may be balanced and considered at the final approval stage:

> (1) the strength of the plaintiff's case;
>
> (2) the risk, expense, complexity, and likely duration of further litigation;
>
> (3) the risk of maintaining class action status throughout the trial;

(4) the amount offered in settlement;

(5) the extent of discovery completed, and the stage of the proceedings;

(6) the experience and views of counsel;

(7) the presence of a governmental participant; and

(8) any opposition by class members.

Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998).  In the notes accompanying the recent amendments to Rule 23, "the Advisory Committee acknowledged that '[c]ourts have generated lists of factors' to determine the fairness, reasonableness, and adequacy of a settlement" such that "adding these specific factors to Rule 23(e)(2) was not designed 'to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'" Id. at *4.

Here, both under the factors enumerated in Rule 23(e)(2) and the factors traditionally considered by the Ninth Circuit, the proposed settlement clearly warrants preliminary approval.[7]

### a.    Strength of Plaintiffs' Case

The initial fairness factor addresses Plaintiffs' likelihood of success on the merits. See Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 964-65 (9th Cir. 2009). In determining the probability of Plaintiffs' success on the merits, there is no "particular formula by which that outcome must be tested." Id. at 965.

Here, Plaintiffs believed strongly that when they reached the merits of their case, they would have been found to be employees for purposes of the California wage laws and the FLSA.  However, Defendants contended that their arrangement

---

[7] Plaintiffs have organized their discussion below based on the final approval factors set forth in decisions from within the Ninth Circuit, as nearly all of these factors encompass the considerations now contained within the language of Rule 23(e) and this Court has used those factors in similar cases.

of providing dancers with a "choice" to work as an "LLC Member" or an employee, which was approved as part of a previous class action settlement, provided them with a unique defense on the misclassification issue, and Defendants also intended to assert that they were entitled to an offset of any potential damages recovered.

It is not entirely clear how these merits issues would have played out, but what is clear is that for many class members, the merits of their claims would not have been reached because the Court had held that Plaintiff Ortega was required to individually arbitrate her claims against Defendants, and it is likely that many - if not all - class members had signed similar arbitration agreements and likewise would have been required to pursue their claims in arbitration.[8]  Inevitably, not all class members would have been willing to dedicate the time and energy into bringing their claims forward in that forum on an individual basis, and therefore they may have received nothing at all.  Courts have recognized that the risk of being compelled to individual arbitration affects the analysis of the strength of class claims at the settlement approval stage. See Does 1-2 v. Deja Vu Servs., Inc., 925 F.3d 886, 897 (6th Cir. 2019) (affirming settlement approval to class of dancers that included dancers at California clubs because numerous decisions enforcing mandatory arbitration agreements with class action waivers "highlight the uphill battle the Dancers would face in attempting to litigate their claims," and "[i]f the arbitration clauses in the Dancers' performance leases are enforced, proceeding with arbitration poses significant risks to many of the Dancers").

          b.    <u>Risk, Expense, Complexity, and Likely Duration of
Further Litigation</u>

In assessing the risk, expense, complexity, and likely duration of further litigation, the Court evaluates the time and cost required. "[U]nless the settlement is

---

[8] See e.g. <u>Yasmeen A. Azizian vs. Spearmint Rhino Consulting Worldwide, Inc., et al.</u>,  USDC Case No. 5:19-cv-02393-DMG-SP, Dkt. 33 (C.D. Cal.).

clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 3 Newberg on Class Actions § 11:50 (4th ed. 2012).

Here, there are a number of risks that Plaintiffs had to consider:

1) The possibility that some or all of the class members would have their claims compelled to individual arbitration (as discussed above);

2) The numerous affirmative defenses asserted by Defendants, including that they were entitled to an "offset" of Plaintiffs' unpaid wage damages;

3) The risk that a class or collective may not be maintained through trial, which would likely be affected by the Court's decision regarding the enforceability of the class action waiver in the dancers' contract;

4) The risks inherent in litigating the merits of Plaintiffs' misclassification claims under California law and the FLSA;

5) The delay in potential recovery for class members;

6) The risk that Defendants would be unable to satisfy a larger judgment if this litigation were to continue.

As Judge Beeler recently noted in granting preliminary approval of a class action settlement on behalf of exotic dancers, the ultimate risk is "the risk of no recovery at all" if the dancers were ultimately held to be properly classified as non-employees and, when viewed in light of that risk and the additional considerations above, the settlement is reasonable. Roe v. Jose Torres L.D. Latin Club Bar, Inc., 2020 WL 2494569, at *6 (N.D. Cal. May 14, 2020) ("When viewed against the risk of no recovery, this settlement is fair.")

c.    Risk of Maintaining Class Action Status Throughout the Trial

Here, the court had ruled that Plaintiff Ortega was bound by an enforceable class action waiver and many, if not all, class members likely signed similar

14

agreements.  This likely would have increased the likelihood of decertification of the class or certification of a much smaller class (potentially excluding those with enforceable class action waivers).

### d.    Amount offered in Settlement

The amount offered in the settlement represents a substantial portion of the classwide damages.  Here, Plaintiffs asserted three central claims that have often been most successful in wage and hour cases brought by exotic dancers:  claims for minimum wage for all hours worked, claims to recover unlawfully withheld gratuities, and claims to recover unlawful house fees or "overhead" fees paid to work.  See See, e.g., McFeeley v. Jackson St. Entm't, LLC, 825 F.3d 235, 246 (4th Cir. 2016) (affirming award of minimum wage damages for all hours worked by dancers despite dancers' earnings directly from patrons); Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 927-33, 952 (S.D.N.Y. 2013) (awarding minimum wage damages for all hours worked and holding that tip-outs were recoverable under NYLL § 196-d).

Based on the experiences of Plaintiffs, counsel estimated $60 per shift in minimum wage damages, and a total of $200 total per shift in house fees and unpaid gratuities claims.  This led to a total potential damages amount of $260 per shift.  Plaintiffs estimated that there were 88,000 dance days,[9] or shifts, worked by class members during the relevant time period, leading to total damages on the

---

[9]    At the current level of participation, the number of "dance days" worked by the participating class members is 31,522.  Not surprisingly, this means that the individuals who have submitted claim forms are those who, on average, likely worked longer and more frequently, and therefore would have had the largest potential recovery if their claims had been successful.

three primary claims of $22,880,000.[10]  The non-reversionary $3,650,000

settlement fund constitutes 16% of this amount.

    As the Court has noted, "[e]ven a fractional recovery of the possible

maximum recovery amount may be fair and adequate in light of the uncertainties of

trial and difficulties in proving the case." Gonzalez v. BMC W., LLC, 2018 WL

6318832, at *7 (C.D. Cal. Nov. 19, 2018), quoting Millan v. Cascade Water Servs.,

310 F.R.D. 593, 611 (E.D. Cal. 2015). Therefore, "[a] recovery of approximately

12-13% of the damages the Settlement Class could have recovered is consistent

with amounts routinely found to be fair and reasonable." Gonzalez, 2018 WL

6318832, at *7, citing In re Celera Corp. Sec. Litig., 2015 WL 1482303, at *6 (N.D.

Cal. Mar. 31, 2015) (approving settlement that was approximately thirteen percent

of maximum recovery); Deaver v. Compass Bank, 2015 WL 8526982, at *7 (N.D.

Cal. Dec. 11, 2015) (approving a settlement that was 10.7 percent of the total

potential liability); see also Villegas v. J.P. Morgan Chase & Co., 2012 WL

5878390, *6 (N.D. Cal. Nov. 21, 2012) (approving gross settlement of

"approximately fifteen percent (15%) of the potential recovery against Defendants,"

noting that "it is well-settled law that a cash settlement amounting to only a fraction

of the potential recovery does not per se render the settlement inadequate or

unfair"); see also Cotter v. Lyft, Inc., 193 F. Supp. 3d 1030, 1039 (N.D. Cal. 2016)

(approval of settlement in wage and hour case that was worth 17% of the workers'

---

[10] In the prior Byrne settlement, the plaintiffs estimated their damages at
$109 per "dance day," approximately half of the estimate here. But as the court
noted at final approval in Byrne, the plaintiffs there never made any calculation of
the potential recovery on the claims to recover unlawful overhead or house fees;
however, the Court did not find that the failure to value this claim prevented final
approval. Byrne, Dkt. 178 at 14-16. Here, the estimated damages per day (or per
shift) are $260, because Plaintiffs taken into account all three of the central claims.

central claim).[11]  Here, the 16% recovery is particularly appropriate as Plaintiffs' counsel was informed of financial challenges faced by the Defendant clubs arising from recent changes to their business model, reflecting the reality that Defendants would not be able to satisfy a larger settlement or a faster payout at this time, particularly in light of Defendants' obligations to continue funding the Byrne settlement, as well as manage their ongoing businesses.

e.      Extent of Discovery Completed, and the Stage of the Proceedings

This factor requires the Court to evaluate whether "the parties have sufficient information to make an informed decision about settlement." Linney, 151 F.3d at 1239.  In this Action, Plaintiffs were in the process of conducting discovery when their action was stayed because of the settlement reached in the Byrne case. Plaintiffs' counsel gained "sufficient" information regarding the case to make an informed decision regarding settlement by briefing and litigating the issues of conditional certification and the motion to compel arbitration, investigating the claims, reviewing data and other information from the Byrne settlement and related to this case, and exchanging information with Defendants throughout the mediation and negotiation process.

f.      Experience and Views of Counsel

"In considering the adequacy of the terms of a settlement, the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties." Gonzalez v. BMC W., LLC, 2018 WL 6318832, at *8 (C.D. Cal. Nov. 19, 2018), citing DIRECTV, Inc., 221 F.R.D. at 528 ("Great weight is accorded to the

---

[11] As the Court observed, after an award of attorney's fees, the Byrne settlement paid approximately 0.73% to 1.25% of the potential recovery to Byrne class members in cash.  Byrne, Dkt. 178 at 15 n.6.

recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation[.]") (internal quotation marks and citations omitted).

Here, the undersigned counsel is highly experienced in wage and hour litigation on behalf of exotic dancers, as well as workers in a number of other industries. As set forth in the materials supporting Plaintiffs' motion for attorney's fees, counsel was among the first plaintiff's attorneys to obtain a ruling under the Dynamex ABC test that dancers in California are employees of the club at which they perform. See Johnson v. VCG-IS, LLC, Case No. 30-2015-00802813 (Super. Ct. Cal. Aug, 31, 2018) (discussed below). Plaintiffs' counsel pioneered litigation in this field, beginning approximately one decade ago by litigating the first cases on behalf of exotic dancers under the Massachusetts wage laws. See Mot. for Attorney's Fees, Dkt. 96 at 13-14. And Plaintiffs' counsel's firm has represented thousands of dancers in arbitrations, class actions, and collective actions in approximately a dozen states across the country, achieving success on summary judgment, class certification, and in settlement. See id.

Under the current participation rate, class members will receive an average share of $6,000 after accounting for attorney's fees. If the parties' additional posted notice at the clubs increases the participation rate to 20% (which seems reasonable), the average share will be $3,700 after fees. The settlement thus provides greater benefits to class members than what has been achieved in other cases. See generally Roe v. Jose Torres L.D. Latin Club Bar, Inc., 2020 WL 2494569, at *3 (N.D. Cal. May 14, 2020) (granting preliminary approval of Rule 23 settlement on behalf of exotic dancers that would pay "$836 per class member"); Doe 1-2 v. Deja Vu Servs., Inc., 2017 WL 2629101, at *5 (E.D. Mich. June 19, 2017), aff'd sub nom. Does 1-2 v. Deja Vu Servs., Inc., 925 F.3d 886 (6th Cir. 2019) (approving Rule 23 settlement on behalf of exotic dancers, many of whom worked in California, where "the average payment from the cash pool will be around $200"); Byrne v. Santa Barbara Hospitality Services, Inc., C.A. No. 17-00527, Dkt. 178

(C.D. Cal. Dec. 14, 2018) (approving settlement proposing to pay 566 claiming class members between $350,884 to $598,453, or average shares of between $620 and $1057 per participating class member). Though the Objector has cited to a lawsuit in New York against Rick's Cabaret where dancers obtained a settlement with a larger average share per class member, see Hart v. Rick's Cabaret Int'l Inc., No. 1:09-cv-03043 (S.D.N.Y.), that case was litigated for many years, a class was certified, and dancers were found to be employees as a matter of law on a classwide basis; however that case did not present the arbitration and class action waiver challenges that Plaintiffs face in the instant case as well as having to overcome a prior settlement that Defendants' claim permitted them to operate in the manner they have been throughout the class period, which makes it unlikely that Plaintiffs would have been able to achieve comparable results in court on a complete classwide basis. Moreover, here the settlement is also influenced by the financial challenges faced by Defendants due to changes in their business model (i.e. converting all entertainers to employees), raising the substantial likelihood that Defendants would be unable to satisfy a larger settlement or judgment at this time.

### g.    Presence of a Government Participant

There is no government participant in this Action, which the Court has previously noted supports approval. Gonzalez v. BMC W., LLC, 2018 WL 6318832, at *8 (C.D. Cal. Nov. 19, 2018) ("No governmental entity is present in this litigation. Therefore, this factor favors approval.").

### h.    Any Opposition by Class Members

A single class member has objected to this Settlement. Plaintiffs' counsel has fully responded to the objection. See Dkt. 95. As discussed in that Response and above, the central argument from Objector's counsel was that the PAGA allocation does not provide sufficient funds given the potential exposure for the PAGA violation of willful misclassification, see Cal. Labor. Code § 226.8. Given

the nature of the contentions in the Objection, it appears to be a lawyer-driven strategy to disrupt this settlement by attorneys in a fourth-filed, copycat action. Regardless, there is only a single objection, and "[i]t is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." DIRECTV, Inc., 221 F.R.D. at 529.

### 4. The Court's Inquiry Regarding the FLSA Settlement

As the Court noted at the preliminary approval stage, this case releases the state wage and hour claims of all class members and only the FLSA claims of those class members who submit a claim form, though there is no specifically designated amount of each settlement share that purports to apply only to the FLSA release. This process is consistent with numerous Rule 23 settlements of wage and hour claims in the Ninth Circuit.  See, e.g., Roe v. Jose Torres L.D. Latin Club Bar, Inc., 2020 WL 2494569, at *3 (N.D. Cal. May 14, 2020) (granting preliminary approval where Rule 23 class members who received settlement check would release FLSA claims, even though not specific amount was designated for FLSA portion of settlement); Trauth v. Spearmint Rhino Companies Worldwide, Inc., 2012 WL 12893448, at *5 (C.D. Cal. Nov. 7, 2012) ("the language of the Agreement now makes clear that only those Dancers who file claims will be deemed to have opted in to an FLSA subclass, and thus that only those Dancers will release their FLSA claims against the Clubs"); La Parne v. Monex Deposit Co., No. SACV 08-0302 DOC, 2010 WL 4916606, at *3 (C.D. Cal. Nov. 29, 2010) (approving hybrid Rule 23 settlement where "only class members who affirmatively "opt-in" to the Settlement should be bound by the Settlement's release of FLSA liability," and there was no separately designated amount for the FLSA release of each claimant). In fact, the Ninth Circuit recently discussed a wage and hour settlement at length that provided for this same process of obtaining FLSA releases. See Roes, 1-2 v.

20

SFBSC Mgmt., LLC, 944 F.3d 1035, 1042 (9th Cir. 2019) (describing that under the settlement, "[i]f a class member did not exclude herself from the settlement, she released all wage claims except claims under the FLSA. If a class member submitted a claim form, she released all claims, including her FLSA claims."). In Roe v. SFBSC, the Ninth Circuit reversed the lower court decision and identified a number of issues that prevented settlement approval, including the class notice, the attorney's fees, the reversionary nature of the settlement, and others.  See id.  The court did not express any concern over 1) the mechanism for obtaining the Rule 23 class members' FLSA release nor 2) the failure of the parties to designate a specific portion of each settlement share as consideration for the release of FLSA claims.

Here, the proposed mechanism for class members to release their FLSA claims is appropriate.  The class members' state law claims for minimum wage and unpaid overtime are stronger than their claims under the FLSA because the California minimum wage is higher than the federal minimum wage, and the Dynamex ABC test applicable to class members' state law wage claims is more favorable to workers than the economic realities test of the FLSA.  Had both sets of claims proceeded to trial and had class members prevailed on their state law claims, they would have been precluded from obtaining separate FLSA damages for those same violations.  See Smith v. Micron Elecs., Inc., 2005 WL 5328543, at *7 (D. Idaho Feb. 4, 2005) ("Courts have held… that an award of damages under state wage claim laws must be offset by the damages recovered under the FLSA to avoid double recovery.").  Given that a prevailing plaintiff could not have received separately designated FLSA damages at trial to prevent double recovery, Plaintiffs submit that there is no reason to require separately designated FLSA damages at the settlement stage.

A review of the caselaw indicates that courts have sometimes confused the questions of whether submitting a Rule 23 claim form is a valid means to obtain a release of FLSA Claims (which it is) with the far more troubling question of

whether a Rule 23 settlement can require class members to release their FLSA claims unless they affirmatively opt-out of the settlement (which has not been proposed here). For example, in <u>Kakani v. Oracle Corp.</u>, 2007 WL 1793774, at *7 (N.D. Cal. June 19, 2007), the court held that "[w]orkers who voluntarily send in a claim form and affirmatively join in the action, of course, can be bound to a full release of all federal and state rights." <u>Id.</u> at *7. That is consistent with the approach here. However, the issue in the <u>Kakani</u> case was that every Rule 23 class member would be bound by the FLSA release *unless they opted out of the settlement*, which the court held was improper. See <u>id.</u>; See also <u>La Parne v. Monex Deposit Co.</u>, 2010 WL 4916606, at *3 (C.D. Cal. Nov. 29, 2010) ("only class members who affirmatively "opt-in" to the Settlement should be bound by the Settlement's release of FLSA liability").[12]

Even in cases where courts have expressed concern over an FLSA release

---

[12] Puzzlingly, several years later in <u>Sharobiem v. CVS Pharmacy, Inc.</u>, 2015 WL 10791914 (C.D. Cal. Sep. 2, 2015), a court in the Central District cited favorably to <u>Kakani</u> but arrived at the opposite conclusion. In <u>Sharobiem</u> (one of the decisions cited upon by this Court in its preliminary approval Order), the court held that it was impermissible for workers who submit a claim form in a Rule 23 class action settlement to simultaneously release their FLSA claims unless there was some "separate value" assigned to the FLSA portion of the release. The only decision relied upon by the court for this conclusion was <u>Kakani</u>, which, as discussed above, reached the opposite conclusion.

Other decisions that have often been cited on this point are inapposite. For example, the <u>Daniels</u> and <u>Selk</u> decisions referred to in the preliminary approval order have nothing to do with releasing FLSA claims through submission of a Rule 23 settlement claim form. See also <u>Daniels v. Aeropostale West, Inc.</u>, 2014 WL 2215708 (N.D. Cal. May 29, 2014); <u>Selk v. Pioneers Mem. Healthcare Dist.</u>, 159 F. Supp. 3d 1164 (S.D. Cal. 2016). Both were FLSA-only settlements with no Rule 23 component, and those cases merely stand for the proposition that an FLSA release without any consideration was not a fair result, see <u>Daniels</u>, 2014 WL 2215708, at *3, and a release in an FLSA-only action should not be so broad as to include claims such as those Title VII of the Civil Rights Act of 1964, and other claims unrelated to traditional wage and hour issues. <u>Selk</u> at 178.

being obtained through a Rule 23 settlement claim form, courts have still found that
the process is appropriate if the class members fully understand the breadth of the
release.  See Selk v. Pioneers Mem. Healthcare Dist., 159 F. Supp. 3d 1164, 1178
(S.D. Cal. 2016) ("Only when opt-in plaintiffs receive independent compensation,
or provide specific evidence that they fully understand the breadth of the release,
will a broad release of claims survive a presumption of unfairness.").[13]  Here, the
settlement notice fully informed class members of the effect that submitting a claim
form would have on their FLSA claims.  See Exhibit 6, Copy of Settlement Notice,
("All Class Members who submit valid Claim Forms shall also be deemed to have
opted in to the FLSA "Fair Labor Standards Act" Settlement Class and shall be
deemed to have released all claims relating to or arising under the FLSA.")

Here, the settlement of FLSA claims is supported by substantial
consideration and therefore it is a fair resolution of a *bona fide* dispute under the
FLSA.  See Mertens v. DIRECTV, LLC, 2018 WL 4998287, at *1 (C.D. Cal. Mar.
7, 2018) (noting that FLSA settlement approval requires "a fair and reasonable
resolution of a *bona fide* dispute").  There can be no doubt that a *bona fide* dispute
regarding FLSA coverage and minimum wage damages existed, as this formed the
basis of two separate conditional certification motions and the Court's detailed
decision granting FLSA notice (all of which occurred prior to mediation).
Moreover, the valuation of the FLSA minimum wage claim is identical to the
valuation of the state law minimum wage claim, except that the state law claim
relies upon a higher minimum wage and therefore the overlapping FLSA minimum
wage claim is valued at a lower amount.  But as noted above, the class members
would not have been permitted double recovery if they had ultimately prevailed
under both statutes.  At bottom, Class Members who submit a claim form and

---

[13] As discussed in footnote 12, *supra.*, Selk was an FLSA-only case without a
Rule 23 component so it is not perfectly applicable in this context.

release their FLSA claims will receive, on average, several thousand dollars in exchange for their release of state and federal wage claims (which were overlapping for the minimum wage violation). This type of process is often used in Rule 23 settlements and does not raise the types of concerns that have been expressed in other cases where workers are releasing their FLSA claims in exchange for no settlement payment at all, or releasing their FLSA claims without ever actually opting in to join the case.

### C.   The Proposed Incentive Payments are Reasonable and Justified

The proposed enhancements for the named plaintiffs in this settlement are eminently reasonable. Plaintiffs request enhancements of $2,500 for the named and opt-in plaintiffs who have been part of this case since nearly the beginning and have participated most actively. These amounts are the same as those that this Court approved as fair in the Byrne settlement, see Byrne v. Santa Barbara Hospitality Services, Inc., 2017 WL 5035366, at *10 (C.D. Cal. October 30, 2017), and they are significantly less than amounts approved in other cases in the district courts in California. Gonzalez v. BMC W., LLC, 2018 WL 6318832, at *12 (C.D. Cal. Nov. 19, 2018) (approving $10,000 incentive payments for six named Plaintiffs); Covillo v. Specialtys Cafe, 2014 WL 954516, *8 (N.D. Cal. Mar. 6, 2014) (awarding $8,000 to class representatives from $2,000,000 fund); Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 300 (N.D. Cal. 1995) (awarding $50,000 to named plaintiff out of $76 million settlement fund); Chu v. Wells Fargo Investments, LLC, 2011 WL 672645, *2 (N.D. Cal. Feb. 16, 2011) (awarding $10,000 incentive awards to two named plaintiffs). As set forth in accompanying Declarations, the four named Plaintiffs have all dedicated substantial time and energy to bringing this case forward, including working on detailed declarations offered in support of conditional certification, advising counsel on settlement negotiations and damages

calculations, and providing documents to counsel.[14] All took the risk that their names would be associated with this lawsuit so that they could seek to obtain relief for themselves as well as for their colleagues. <u>Gonzalez v. BMC W., LLC,</u> 2018 WL 6318832, at *12 (C.D. Cal. Nov. 19, 2018) ("In undertaking this lawsuit, Named Plaintiffs have put their ability to secure future employment at risk.") Given these considerations, the awards of $2,500 per person are justified.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Final Approval should be granted.

---

[14] The named Plaintiffs' Declarations attesting to the time that they dedicated to this lawsuit are attached hereto as Exhibits 2, 3, 4 and 5.

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

1

2

3  Dated: June 9, 2020                           Respectfully submitted,
                                                 ADRIANA ORTEGA, on behalf of herself
                                                 and all other similarly situated,
4
                                                 By her attorneys,
5

6                                                */s/ Shannon Liss-Riordan*
                                                 Shannon Liss-Riordan (State Bar No.
7                                                310719)
                                                 sliss@llrlaw.com
8                                                LICHTEN & LISS-RIORDAN, P.C.
                                                 729 Boylston Street, Suite 2000
9                                                Boston, MA 02116
                                                 Telephone: (617) 994-5800
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT